UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

KRYSTYNA ANNUNZIATA, CARMELA :
MARINO, CAROL PEARSON, and ROSEMARIE :
PELLETIER, :

                 Plaintiffs, :       15-CV-03363 (NSR)

      -against- :       OPINION & ORDER

                        :

INTERNATIONAL BROTHERHOOD OF :
ELECTRICAL WORKERS LOCAL UNION # :
363, and SAMUEL FRATTO, :

                        :

          Defendants. :

-------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge:

    Plaintiffs Krystyna Annunziata, Rosemarie Pelletier, Carol Pearson, and Carmela Marino

bring this action against their former employer, the International Brotherhood of Electrical

Workers Local Union # 363 (the "Union"), and their former supervisor, Samuel Fratto, alleging

violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C., § 2000e et seq.;

the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d); the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. §§ 621–34; the New York State Human Rights Law ("NYSHRL"); and

the New York Labor Law ("NYLL"). (Fourth Amended Complaint ("FAC"), ECF No. 31.)

    Presently before the Court is Defendants' motion for summary judgment on each of

Plaintiffs' claims. (Defs.' Mot. for Summ. J. ("Defs.' Mot."), ECF No. 44.) For the reasons that

follow, Defendants' motion is GRANTED in part and DENIED in part.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/29/18

**BACKGROUND**[1]

The following facts are derived from the parties' respective Local Rule 56.1 statements, the affidavits submitted in connection with the instant motion, and the exhibits attached thereto.[2]

## A. The Union

Defendant Local 363 ("the Union") is a labor organization that represents approximately 2,600 members who work as residential and commercial electricians as well as telecommunications workers who install and maintain the telephone, computer network, internet, and fiber optic systems. (Pls.' Resp. to Defs.' Rule 56.1 Statement of Facts ("Pls.' 56.1") ¶ 7, ECF No. 69.) The Union is affiliated with the International Brotherhood of Electrical Workers ("IBEW") and reports to the international office. (*Id.*)

The Union's Business Manager is its principal officer who is elected for 3-year terms and

---

[1] In their 56.1 statement, Plaintiffs repeatedly indicate that they have "insufficient knowledge or information to form a belief as to the truth" of statements contained in Defendants' various affidavits, declarations, and depositions. (*See generally* Pls.' Resp. to Defs.' Rule 56.1 Statement of Facts ("Pls.' 56.1"), ECF No. 69.) Plaintiffs, however, fail to explain why—after an opportunity for discovery spanning several months—they are unable adduce evidence regarding those matters. Given Plaintiffs' failure to provide such an explanation, the Court considers those facts supported by admissible evidence for which Plaintiffs cite no evidence to the contrary, *undisputed* for the purposes of this motion. *See Cruz v. Wyckoff Heights Med. Ctr.*, No. 13-CV-08355 (ER), 2016 WL 4533568, at *1 (S.D.N.Y. July 19, 2016) (deeming facts admitted where they were supported by evidence in the record and plaintiff failed to independently cite admissible evidence to the contrary); *Dasrath v. Stony Brook Univ. Med. Ctr.*, No. 12-CV-1484 (SJF) (SIL), 2015 WL 1223797, at *1 n.1 (E.D.N.Y. Mar. 17, 2015) ("Statements in [defendant's 56.1 Statement] to which plaintiff objected but failed to provide a citation to the evidence as required by Local Rule 56.1(d) are not considered disputed."); *see also Feis v. United States*, 394 F. App'x 797, 799 (2d Cir. 2010) (affirming district court's refusal to consider as disputed "any statement supported by admissible evidence to which Plaintiff objects, *but does not support with evidence.*" (emphasis in original)).

[2] Where only one party's 56.1 Statement is cited, the factual statement is either undisputed or no admissible evidence has been offered to refute that fact.

2

is responsible for the Union's day-to-day operations. (*Id.* ¶ 9.) The Business Manager appoints individuals to assist him, who hold the titles of Assistant Business Manager and Business Representative. (*Id.* ¶ 10.) Business Representatives and Assistant Business Managers cover assigned territory within the Union's jurisdiction, handling grievances, negotiating contracts, communicating with members, resolving work place disputes, organizing new members, scouting non-union jobsites, enforcing health and safety rules, and communicating with Union employers. (*Id.* ¶ 11.) These individuals are typically Union members who worked in the field before joining the Union staff. (*Id.* ¶ 12.) Assistant Business Managers and Business Representatives are, thus, paid electrician journeymen wages and benefits, which are generally equal to—or slightly greater than—those earned in the field. (*Id.* ¶ 12.) These greater wages are meant to counterbalance the lack of overtime wages for Union employees, and make the positions enticing to Union members. (*Id.*)

Defendant Sam Fratto has been the Union's Business Manager from July 2011 through the present. (*Id.* ¶ 15.) As Business Manager, Fratto has broad discretion to determine the Union employees' wage and benefits. (Pls.' 56.1 ¶ 181.)

Fratto's predecessors include Cosmo Damiani, who served as the Union's Business Manager from 1980 to 1990; Joseph Maraia, who was the Union's Business Manager from 1990 through 2005; and most recently, John Maraia, who served as the Union's Business Manager from 2005 through 2011. (*Id.* ¶ 14.)

B. **Plaintiffs' Employment with the Union**

Plaintiff Krystyna Annunziata was employed by the Union from 1989 through April 5, 2016, when she was terminated. (*Id.* ¶ 1.) During her time with the Union, Annunziata was an office clerical worker. (*Id.* ¶ 85.) In her role, Annunziata, made the Union per capita payments,

tracked contractor payments for employees, informed contractors when they did not pay correctly, recorded contractor report numbers, cross-checked Union reports with international reports, and sent reports to the IBEW's international office. (*Id.* ¶ 86.) Annunziata was also the Union's receptionist and functioned as the secretary for business agents—often performing clerical work such as sorting mail, and filing and scanning documents. (*Id.* ¶ 87–88.) Annunziata typically worked from 9 A.M. to 5 P.M. and was not expected to work on holidays, weekends, or days off. (*Id.* ¶¶ 90–91.)

Plaintiff Carmela Marino was employed by the Union from 1983 to 1986, when she resigned. (*Id.* ¶ 2.) Marino eventually returned to the Union and worked from 1999 through April 20, 2016, when she resigned for a second time. (*Id.* ¶ 2.) Throughout her time with the Union, Marino was part of the clerical staff. (*Id.* ¶ 76.) Until 2015, her main job function was to serve as the Business Manager's secretary. (*Id.*) As the Business Manager's secretary, Marino took messages, typed letters and communications, maintained the office calendar, scheduled meetings and outings, and made travel arrangements. (*Id.* ¶ 77.)

For a portion of her employ, Marino also functioned as the Office Manager. (*Id.* ¶ 76.) In her capacity as Office Manager, Marino handled vacation and time off requests, delegated incidental office projects among staff, participated in staff interviews and advertisements for new office positions, notified contractors of upcoming audits, and helped coordinate Union elections. (*Id.* ¶ 78.) During her entire tenure with the Union, Marino worked 9 A.M. through 5 P.M. (*Id.* ¶ 75.)

Plaintiff Carol Pearson was employed by the Union from 1995 through February 2015, when she retired. (*Id.* ¶ 3.) During her time with the Union, Pearson was an office clerical worker, completing mainly administrative tasks. (*Id.* ¶ 53.) Her primary duties included cross-

checking and recording contractor reports, bank statements, and annuity amounts into the computer, reviewing annuity applications to ensure basic withdrawal requirements were met, transferring requested annuity withdrawal amounts, and printing annuity checks for members. (*Id.* ¶ 54.) Absent extraordinary circumstances requiring paid overtime, Pearson's working hours were 9 A.M. through 5 P.M. throughout her tenure with the Union. (*Id.* ¶ 56.) Additionally, Pearson received 21 days in paid time off, which were days she was not required to work or remain "on-call" with the Union. (*Id.* ¶ 57.)

Plaintiff Rosemarie Pelletier was employed by the Union from 1976 through 1998, when she resigned. (*Id.* ¶ 4.) She resumed her employment four weeks later, and continued through January 2015, when she retired. (*Id.*) Throughout her time with the Union, Pelletier was a clerical worker. (*Id.* ¶ 59.) She also served as the Office Manager from 1986 through 1991 (*Id.* ¶ 61.) Pelletier's main job function was to work with contractors to collect and record benefits owed to the Union. (*Id.* ¶ 63.) She also assisted Graham by suggesting computer system changes that Graham would then execute. (*Id.* ¶ 66.) Similarly, she provided Heim support in his duties, but did not perform the same job as him. (*Id.* ¶¶ 70–71.) By the time she retired, Pelletier received 21 days of paid time off annually, during which she was not required to perform any work for the Union. (*Id.* ¶ 60.)

### C. Union Employee Benefits

Plaintiffs maintain that female Union staff members were systematically denied compensation equal to that of their male counterparts. (FAC ¶ 23; Pls.' Opp. to Defs.' Mot. for Summ. J. ("Pls.' Opp.") at 6, ECF No. 58.) Specifically, Plaintiffs claim that they were not provided the same benefits as male Union workers, who received health, pension, annuity, vacation, and supplementary unemployment benefits. (Pls.' 56.1 ¶ 193.) The male comparators

who Plaintiffs contend received better benefits but performed similar work are Michael Graham, Harry Miller, Ross Olivieri, and John Heim. (Pls.' 56.1 ¶¶ 55, 62, 74 & 84.)

Michael Graham worked for the Union from 2005 through February 2013 as a computer programmer and information technology ("IT") specialist. (*Id.* ¶ 101.) At the time he was hired by the Union, Graham had six years of IT experience. (*Id.* ¶ 103.) His responsibilities included installing, monitoring, and upgrading the Union's computer systems, security systems, and email systems to ensure compliance with federal regulations. (*Id.* ¶ 104.) Graham was also tasked with managing the Union's website and customizing the Union's computers and computer systems so that the staff could use them more efficiently. (*Id.* ¶¶ 105, 111.) Graham was required to address the Union's computer-related needs at any time, on any day—including on weekends and during vacations. (*Id.* ¶ 114.)

Harry Miller was hired as a Business Representative for the Union in April 2015 to work with the Union President/Assistant Business Manager, Gil Heim. (*Id.* ¶ 116.) In his role, Miller negotiated telephone and manufacturing contracts; processed and evaluated telephone contract grievances; attended Union meetings, rallies, and political functions; met with shop stewards in the field; met with company representatives in the field; traveled throughout New York to represent the Union; processed jurisdictional disputes; organized new Union workers; coordinated political action; and participated in shop elections. (*Id.* ¶ 121.)

Miller was hired because of his experience as the Union's Middletown Unit Chairman for Frontier Communications, a large company that employs Union members. (*Id.* ¶ 119.) His working hours generally begin around 8:30 A.M. and end whenever the job is complete for the day. (*Id.* ¶ 120.) He is required to be on call for the Union 24 hours per day, 365 days per year, even when he is off for vacation and personal time. (*Id.*)

Ross Olivieri was hired as an Assistant Business Manager and Referral Agent by the Union in 2007, after having been an electrician in the field since 1979. (*Id.* ¶ 122–23.) Olivieri also serves as an instructor for the apprenticeship school and for his assigned territory. (*Id.* ¶ 123.) His work day typically begins at 7:30 A.M. and, like Graham and Miller, he is on call for the Union's needs 24 hours per day, 365 days per year. (*Id.* ¶ 124.) In his role, Olivieri regularly processes jurisdictional disputes; attends job site meetings, meets with organizers in the field, negotiates contracts, processes and resolves grievances, attends IBEW conferences, teaches membership courses, attends Executive Board meetings, maintains referral records, organizes non-Union workplaces, attends rallies, communicates with members for job referrals, creates work tickets, and communicates with contractors about job referrals and manpower issues. (*Id.* ¶ 125.) Many of Olivieri's duties require first-hand knowledge of the electrical trade. (*Id.* ¶ 126.)

John Heim worked for the Union from 1991 to 2008 as a Controller, mainly performing internal accounting services. (*Id.* ¶ 127.) Heim also served as an Office Manager, though this role accounted for less than 10% of his work responsibilities. (*Id.* ¶¶ 128, 130.) Prior to his employ with the Union¸ Heim obtained a Bachelor's Degree in Finance from Iona College and a Master's Degree in Accounting from Long Island University in 1995. (*Id.* ¶ 129.)

Heim regularly engaged in a variety of accounting tasks, including: preparing IRS forms for the Union, drafting and preparing grant reports, maintaining the Union's accounts payable and accounts receivable reports, drafting and maintaining Political Action Committee Fund Reports, preparing the Union's Pension Benefit Guarantee filing, preparing financial reports for the Union, monitoring Union investment accounts, and working with attorneys and accountants to monitor the Union's collection procedures to ensure compliance with federal regulations. (*Id.* ¶ 131.) Heim, like Graham, Miller, and Olivieri, was expected to work as needed on any and all

days off, including sick days and vacation days. (*Id.* ¶ 134.)

Plaintiffs contend that they have repeatedly attempted to acquire the same benefits as these alleged male counterparts throughout their years of employ with the Union, but to no avail. (*Id.* ¶ 190.) Such efforts, Plaintiffs further contend, were met with various vulgar comments from previous Union managers, including Joseph Maraia's alleged statement that if Plaintiff Pelletier wanted benefits, she should "get under the desk," and Ray Frosco's alleged statement that Ms. Marino could have benefits "if she had a penis."[3] (Decl. of Susan Kaplan in Opp. to Defs.' Mot. for Summ. J. ("Kaplan Decl."), ECF No. 57, Ex. L, Pelletier Decl. ¶ 45; Kaplan Decl., Ex. F, Dep. of Carmela Marino, October 18, 2016 ("Marino Tr.") at 241:14-17). Plaintiffs eventually voiced their grievances to Richard Parker, a fund trustee and contractor, who met with Sam Fratto in November 2014 regarding the concerns of the women in the office. (Pls.' 56.1 ¶ 202.) Sam Fratto assured Parker that he was "working on something" regarding the clerical workers' benefits. (*Id.*)

---

[3] Defendants' contend that such statements constitute inadmissible hearsay. Under Federal Rule of Evidence 801(d)(2)(D), however, a statement is *not* hearsay if it "is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship while it existed[.]" Fed. R. Evid. 801(d)(2)(D). "A sufficient foundation to support the introduction of such vicarious admissions therefore requires only that a party establish (1) the existence of [an] agency relationship [between the declarant and employer], (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Pappas v. Middle Earth Cond. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992); *accord Farganis v. Town of Montgomery*, 397 F. App'x 666, 668 (2d Cir. 2010) (summ. order).

    Although the Court reserves the right to make an ultimate ruling on the admissibility of these statements at a later date, given that Defendants fail to advance any argument why they do not fall within this well-recognized hearsay exception, the Court will consider the statements admissible for the purposes of summary judgment.

**D. 2014 Benefits Offer**

In December 2014, Fratto circulated a wage and benefit offer to every clerical worker in the office. (*Id.* ¶ 140; Kaplan Decl., Ex. U.) The new benefits package offered Union employees the average journeymen wages, benefits, and working conditions. (*Id.* ¶ 141.) This benefits offer was not advantageous for some clerical workers, like Pelletier, because their wage rates had already surpassed that of most journeyman electricians. (*Id.* ¶ 142.) However, Union employees were given the option of choosing the new benefits package or keeping their current wages and benefits, meaning each individual staff member could determine whether it as advantageous to accept or reject the offer. (*Id.*) Shortly after Fratto presented the Union workers this benefits package, he added an option for clerical staff to reject the offer and instead accept a $2 per hour raise. (*Id.* ¶ 35.) Ultimately, only one Union employee, Nicole DeFelice, accepted the new benefits package. (*Id.* ¶ 207.)

**E. Hostile Work Environment**

Plaintiffs contend that they were subjected to sexual harassment and a hostile work environment throughout their employment with the Union. (FAC ¶ 95.) Specifically, Plaintiffs maintain that Fratto frequently referred to them as "girls" and commented on their attire and orderliness—even calling Plaintiff Annunziata a "slob" and likening her appearance to that of a "bag lady." (Marino Decl., Ex. 1, Entries for 12/2014 and 5/2014.) Plaintiffs also testified about an incident in 2013 where another male Union manager told an outside vendor that Plaintiffs Annunziata and Pearson were not the "brightest bulbs in the bunch." (Pearson Tr. at 63:2-15; FAC ¶ 107.)

These relatively recent incidents of harassment, Plaintiffs further argue, were a continuation of the more severe harassment they experienced at the hands of previous Union

supervisors throughout the years, including former supervisors telling Plaintiffs to "get under the desk" for benefits (Marino Decl., Ex. 1, Entry for 1999), commenting on Plaintiffs' breasts (Annunziata Decl., Ex. 1, Entry for 1980–1990), propositioning and groping Plaintiffs (Pelletier Decl., Ex. 1, Entry for 1980s to 2005), and even, on one occasion, Joe Maraia forcefully placing Plaintiff Pelletier's hand on his penis (*Id.*, Entry for 12/27/1997).

### F. EEOC Charge

Plaintiffs filed a charge with the Equal Employment Opportunity Commission (the "EEOC") on December 29, 2014 in connection with Defendants' alleged acts of discrimination. (Pls.' 56.1 ¶ 16.) The Union received official notice of this charge on January 5, 2015 via United States Postal Service first class mail. (*Id.* ¶¶ 17–18.)

### G. Retaliatory Acts

Plaintiffs contend that Defendants engaged in a pattern of retaliation after they began voicing their grievances regarding the Union's alleged discrimination. (Pls.' Opp. at 17.) Once Fratto became aware of Plaintiffs' concerns regarding their benefits package, he purportedly sent an email in which he expressed his frustration with his wife over an unrelated matter by saying, "I will reprimand my wife because I believe she waited too long to pass that message[.] I will fire her tonight[,] in fact she is getting her own personal package just like Rose[,] Carmela[,] and Kristyna tomorrow"—referring to Plaintiffs Pelletier, Marino, and Annunziata, respectively. (Kaplan Decl. Ex. T.) Marino was subsequently replaced as Office Manager by Pam Brown and was moved to the front desk, where she experienced frequent interruptions to her work. (Marino Decl. ¶ 12 & Ex. 1, Entry for January 5, 2015). Marino also lost many of her responsibilities, which were re-assigned to other employees, and was given new and alien tasks. (Marino Decl., Ex. 1, Entry for January 13, 2015.)

Plaintiff Annunziata claims to have suffered similar retaliatory acts, including numerous disciplinary "write-ups," culminating in her eventual termination on April 5, 2016. (Annunziata Decl., Ex. 1, Entry for 1/29/15; Pls.' 56.1 ¶ 179.) Defendants maintain, however, that Annunziata was terminated because she failed to pay the Union's per capita tax to the international office— one of her primary responsibilities (Pls.' 56.1 ¶¶ 85, 173, 179)—for several months. (*Id.* ¶ 172.) As a result of her late reporting, the Union had to pay lump sum of $348,000 to the international office and provide an explanation to the membership about the abrupt change in financials.  (*Id.* ¶ 176.) When Annunziata was given the opportunity to explain what caused the delay, she informed Fratto that another Union employee, Marybeth Thomas, had asked for more time to reconcile the electronic report with Annunziata's paper report. (Kaplan Decl., Ex. H, Excerpts of Deposition of Krystyna Annunziata, October 20, 2016 ("Annunziata Tr.") at 233:1-21.) Annunziata further testified that she cleared the delay with superior, Pam Brown, and that such delays had never caused a problem in the past. (*Id.* at 237: 3-11; 243:3-6; 245–246.) Despite Annunziata's explanation, she was immediately terminated. (Pls.' 56.1 ¶ 178.)

## H.  Procedural History

Plaintiffs commenced the instant action on April 30, 2015. (ECF No. 1.) After a number of amendments to Plaintiffs' complaint, Defendants filed an answer on July 7, 2016. (ECF No. 34.) After discovery was completed, Defendants moved for summary judgment on all of Plaintiffs' claims on May 16, 2017. (ECF No. 44). The Court now considers each of Defendants' arguments in turn.

## STANDARD ON MOTION FOR SUMMARY JUDGMENT

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summ. order).

Summary judgment is appropriate where a party who bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323 (internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted). However, the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted). Further, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).


**DISCUSSION**

I.     **Discriminatory Pay Claims**

       A.  **Equal Pay Act Claims**

The Equal Pay Act (EPA) was enacted "to remedy what was perceived to be a serious

and endemic problem of [sex-based] employment discrimination in private industry."
*Washington Cty. v. Gunther*, 452 U.S. 161, 171 (1981) (internal quotation marks omitted). To prove an EPA violation, "a plaintiff must demonstrate that [ (1) ] the employer pays different wages to employees of the opposite sex; [ (2) ] the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and [ (3) ] the jobs are performed under similar working conditions." *EEOC v. Port Authority of N.Y. and N.J.*, 768 F.3d 247, 254–55 (2d Cir. 2014) (internal quotation marks omitted) (alterations in original). "While the equal work inquiry does not demand evidence that a plaintiff's job is 'identical' to a higher-paid position, the standard is nonetheless demanding, requiring evidence that the jobs compared are 'substantially equal.'" *Id.* at 255.

The Equal Employment Opportunity Commission ("EEOC") regulations provide the relevant criteria in determining whether two positions are sufficiently "equal" and operationalize the "skill, effort, responsibility, and similar working conditions" referenced in the statute. *Miller v. City of New York*, No. 15-CV-7563, 2018 WL 2059841, at *4 (S.D.N.Y. May 1, 2018) (citing 29 C.F.R. § 1620). According to these regulations, "[s]kill includes consideration of such factors as experience, training, education, and ability." 29 C.F.R. § 1620.15. Effort, on the other hand, "is concerned with the measurement of the physical or mental exertion needed for the performance of a job [including] [j]ob factors which cause mental fatigue and stress . . . ." 29 C.F.R. § 1620.16(a). Responsibility refers to "the degree of accountability required in the performance of a job, with emphasis on the importance of the job obligation." 29 C.F.R. § 1620.17(a). Similar working conditions, in turn, "encompasses two subfactors: surroundings and hazards. Surroundings measure the elements . . . regularly encountered by a worker, their intensity and frequency. Hazards take into account the physical hazards regularly encountered,

their frequency and the severity of injury they can cause." 29 C.F.R. § 1620.18(a) (internal quotation marks omitted).

In light of these factors, Plaintiffs in the present action fail to identify sufficiently similar male comparators to sustain their EPA claims. For ease and clarity, the Court addresses each Plaintiff and their purported comparators individually.

### i. Carol Pearson

First, Plaintiff Carol Pearson offered the male comparator John Heim. (Pls.' 56.1 ¶ 55.) There are, however, significant differences in the qualifications, responsibilities, and working conditions of Pearson and Heim.

Heim worked for the Union as a Controller, performing internal accounting tasks, including, *inter alia*, preparing IRS Forms, grant writing, monitoring the Union's collection procedures to ensure compliance with federal regulations, preparing financial reports, and monitoring the Union's investment accounts. (Pls.' 56.1 ¶ 127–131; Heim Decl. ¶¶ 2 & 5.) He obtained a Bachelor's Degree in Finance in 1987 from Iona College and a Master's Degree in Accounting from Long Island University in 1995. (Pls.' 56.1 ¶ 129; Heim Decl. ¶ 3.) Heim worked for the Union from 1991 until 2008, during which time he was expected to work from 9 A.M. until at least 7 P.M. on a typical day and as needed on any and all days off. (Pls.' 56.1 ¶ 133-34; Heim Decl. ¶¶ 2, 6–7.)

Pearson, on the other hand, was an office clerical worker, completing mainly administrative tasks during her tenure with the Union. (Pls.' 56.1 ¶ 53.) Absent extraordinary circumstances requiring paid overtime, Pearson's working hours were 9 A.M. through 5 P.M. and she received 21 days in paid time off, during which she was not required to work (Pls.' 56.1 ¶¶ 56 & 57; Fratto Decl. ¶ 30.) Moreover, Pearson's highest level of education is grammar

school. (Pls.' 56.1 ¶ 58; Pearson Tr. 6:22–23.) Pearson's hours, responsibilities, and qualifications, were thus, distinct from Heim's.

Plaintiff's counsel nonetheless contends that Pearson and Heim are similarly situated "by virtue of their shared status as union members." (Pls.' Opp. at 7.) However, a common employer and Union membership, alone, is insufficient to establish an inference of discrimination based on their unequal pay or benefits. Rather, a plaintiff must show that the specific jobs being compared "entail common duties or content, and do not simply overlap in titles or classifications." *Port Auth.*, 768 F.3d at 255.

Further, Plaintiff Pearson's argument that she and Heim are similarly situated because she took over some of his responsibilities upon his departure is equally unavailing. "[S]ome overlap in the requirements of the two jobs[ ] is not . . . sufficient to show substantial equality under the EPA." *Husser v. New York City Dep't of Educ.*, 137 F. Supp. 3d 253, 267 (E.D.N.Y. 2015) (internal quotation marks omitted). Rather, the relevant inquiry is whether "the jobs have the same 'common core of tasks.'" *Port Auth.*, 768 F.3d at 255 (internal quotation marks omitted). Here, Plaintiff has failed to adduce sufficient evidence to make such a showing. Of all of Heim's responsibilities, Pearson only took over "bank reconciliation," which involved recording bank statements from the various Funds in the Union's computer. (Pearson Tr. at 33.) Heim's more substantive accounting duties were not delegated to the Union's clerical staff. (Pls.' 56.1 ¶ 137; Heim Decl. ¶ 9; Fratto Decl. ¶ 49.) Accordingly, Defendant's motion for summary judgment on Plaintiff Pearson's EPA claim is granted.

### ii. Rosemaire Pelletier

Plaintiffs similarly fail to provide a proper comparator for Plaintiff Pelletier. Pelletier worked for the Union beginning in 1976 through January 2015, when she retired. (Pls.' 56.1 ¶ 4.)

From 1986 to 1991, Pelletier served as an Office Manager. (Pls.' 56.1 ¶ 61.) Pelletier worked as an office clerical worker throughout the rest of her employ. (*Id.* ¶ 59; Fratto Decl. ¶ 2.) Pelletier's responsibilities primarily included working with contractors to collect and record benefits owed to the Union, and computer-related tasks. (Pls. 56.1 ¶¶ 63–67.) Specifically, Pelletier testified that she would help create Excel spreadsheets and worked with Michael Graham, the IT specialist, to identify the programming needs of the Union, which Graham would then execute. (Pelletier Tr. At 89:4-15.) By the time she retired, Pelletier received 21 days of paid time off annually, during which she was not required to perform any work for the Union. (Pls.' 56.1 ¶ 60.)

Pelletier maintains that her responsibilities and job are comparable to those of Ross Olivieri, John Heim, and Michael Graham. (Pls.' 56.1 ¶ 62; Pelletier Tr. 81:510, 90:10-12, 91:3-17.) Pelletier, however, fails to provide sufficient evidence to support such an inference. As this Court has already addressed, John Heim handled the internal accounting functions of the Union, a responsibility that undoubtedly made use of his master's degree in accounting. Beyond testifying in her deposition that she "assist[ed] John [Heim] in many aspects of his job," (Pelletier Tr. at 84:7-8.) Pelletier adduced no evidence regarding how her responsibilities, experience, qualifications, and work conditions were substantively comparable to those of Heim. For instance, she did not aver that she assisted with Heim's more specialized accounting duties, that she was constantly on call, or that she had similar credentials.

Pelletier similarly fails to establish Michael Graham as an appropriate comparator. Graham worked for the Union from 2005 through February 2013, as a computer programmer and in-house IT specialist. (Pls.' 56.1 ¶ 101; Declaration of Michael Graham, dated March 29, 2017 ("Graham Decl.") ¶ 2.) Prior to working for the Union, Graham had six years of IT and

programming experience with various organizations. (Pls.' 56.1 ¶ 103; Graham Decl. ¶ 6.) At the

Union, Graham installed, monitored, and upgraded all computer systems, security systems and

email systems. (Pls.' 56.1 ¶ 104; Graham Decl. ¶ 7.) He was responsible for the Union's website

as well as the entire internal computer system—customizing it so that the Union could ensure

compliance with federal regulations. (*Id.*) Additionally, Graham used his fluency in RPG, a

computer language that creates the AS400 programs, to write modifications to the AS400 code

so that the program was usable by the Union staff. (Pls.' 56.1 ¶ 106; Graham Decl. ¶ 11.)

Pelletier maintains that she also engaged in a number of "computer-related tasks" during

her time with the Union. (Pls.' 56.1 ¶ 63.) Specifically, Pelletier testified that she created

Microsoft Excel spreadsheets for other Union employees and suggested programming changes to

Graham. (Pls.' 56.1 ¶ 64–67; Pelletier Tr. 74–75.) However, such tasks did not involve

"programming" in the traditional sense; Pelletier was not required to know any programming

language or to actually code distinct computer programs. Nor did Pelletier testify that she

participated in the maintenance of the entire internal computer system and website—which were

key responsibilities for Graham as the Union's IT specialist. (Pls.' 56.1 ¶¶ 104, 65; Pelletier Tr.

at 54:3-9; Graham ¶ 7.) Rather, Pelletier worked within the programs that had been coded and

modified by Defendant Graham, as did the entire Union staff. (Pelletier Tr. at 54:3-23, 89:11-

16.) Pelletier also failed to provide any evidence regarding how her level of experience was

comparable to Graham's years of experience as an IT Specialist.

Finally, Pelletier likewise fails to produce any evidence suggesting that Ross Olivieri is a

proper comparator. Olivieri was hired by the Union in 2007 after having been an electrician in

the field since 1979. (Pls.' 56.1 ¶ 122.) Olivieri works as an Assistant Business Manager and

Referral Agent as well as an instructor for the apprenticeship school and for his assigned

territory. (Pls.' 56.1 ¶ 123.) Olivieri regularly performs a slew of functions, including processing jurisdictional disputes, attending job site meetings, meeting with organizers in the field, negotiating contracts, processing and resolving grievances, attending conferences and rallies, teaching membership courses, and communicating with contractors about job referrals. (Pls.' 56.1 ¶ 125; Olivieri Decl. ¶ 19.) Further, many of Olivieri's duties require first-hand knowledge of the electrical trade because he must assess members' qualifications and contractor manpower requests. (Pls.' 56.1 ¶ 126; Olivieri Decl. ¶ 18.) Like Graham and Heim, Olivieri was also required to work atypical hours, and remain on call for the Union during days off and vacations. (Pls.' 56.1 ¶¶ 114, 124, 133–134.)

While Pelletier testified during her deposition that she taught Olivieri how to enter referrals into the computer (Pelletier Tr. 92:14–93:25), she has not adduced evidence suggesting she engaged in any of Olivieri's many other substantive tasks or how her experience and education compares to Olivieri's, who was an experienced electrician at the time of his hiring— experience he claims is indispensable to his job function. (Pls.' 56.1 ¶ 126; Olivieri Decl. ¶ 18.) Because Pelletier has not provided evidence to suggest the her experience, educational attainments, specialized skills, or working conditions are substantively similar to any of these male "comparators," Defendant's motion for summary judgment on Pelletier's EPA claim is granted.

### iii. Carmela Marino

Plaintiff Carmela Marino similarly fails to provide any proper male comparators for her EPA claim. Marino worked for the Union from 1984 through 1986 and 1999 through April 20, 2016. (Pls.' 56.1 ¶ 73.) During the entirety of her employment, Marino was a part of the Union's clerical staff and worked from 9 A.M until 5 P.M. (Pls.' 56.1 ¶¶ 75–76.) Marino's primary job

function was to serve as the Business Manager's secretary. (Pls.' 56.1 ¶ 76; Fratto Decl. ¶ 2; Marino Tr. 75–76, 134–135.)  However, she functioned as Office Manager and was involved in office-wide administrative duties. (*Id.*) As the Business Manager's secretary, she took messages, typed letters and communications, maintained the office calendar, scheduled meetings, reset email passwords on the AS/400 program when employees were "locked out," added available printers to staff computers, made travel arrangements, and printed contractor reports from the AS400. (Pls.' 56.1 ¶ 77.) As Office Manager, Marino handled vacation and requests for time off, delegated incidental office projects among staff (but did not divide the general workload among employees), participated in staff interviews, notified contractors of upcoming audits, worked with the election coordinating company to coordinate the Union elections, and typed meeting notes. (Pls.' 56.1 ¶ 78.)

Graham is, thus, not an appropriate comparator because his programming and IT responsibilities are entirely distinct from Marino's duties. (Pls.' 56.1 ¶¶ 80, 101, 104–06, 111, 115.) Indeed, Marino explicitly admitted that she performed absolutely no programming work. (Pls.' ¶ 81; Marino Tr. 111:2–4.) Nor did Marino provide evidence suggesting that she possessed specialized knowledge and experience comparable to Graham.

Similarly, Heim is not a proper comparator because Marino has provided no evidence to suggest that her clerical duties were comparable to his accounting responsibilities. Nor has she adduced evidence relating to how her experience, specialized knowledge, or education compares to Heim's.

Marino's attempt to characterize Harry Miller as a comparator is equally unavailing. Harry Miller was hired in April 2015 as a Business Representative with the Union based on his extensive experience as the Middletown Unit Chairman for Frontier Communications, a large

company that employs Union members. (Pls.' 56.1 ¶¶ 116, 119; Declaration of Harry Miller, dated March 31, 2017 ("Miller Decl.") ¶¶ 1–2, 4; Fratto Decl. ¶ 45.) Miller primarily performed representational functions, including negotiating telephone and manufacturing contracts; processing telephone contract grievances; attending Union meetings, rallies, and political functions; meeting with shop stewards in the field; meeting with company representatives in the field; travelling throughout New York to represent the Union; processing jurisdictional disputes, organizing new union workers, meeting with union and non-union contractors, coordinating political action, participating in shop elections, and attending meeting with shop stewards or company representatives. (Pls.' 56.1 ¶ 121; Miller Decl. ¶ 6.) Notably, absent some copying and mailing, which was expected of all employees, Miller did not engage in clerical work. (Pls.' 56.1 ¶¶ 82, 117–18.) Plaintiffs advance no argument or evidence regarding how or why Miller's responsibilities are comparable to Marino's clerical work. Nor do Plaintiffs address the differences in Miller and Marino's hours—Miller was expected to be on call with the Union twenty-four hours per day, 365 days a year, including during off days and vacation time; Marino was not. (*Id.* ¶¶ 75, 120.) Accordingly, Defendants' motion for summary judgment on Marino's EPA claim is granted.

### iv. Krystyana Annunziata

Plaintiff Krystyana Annunziata's claim that Ross Olivieri is a valid comparator are also unavailing. Annunziata worked for the Union from 1989 through April 5, 2016. (Pls.' 56.1 ¶ 83.) While there, Annunziata was an office clerical worker, whose main job function was processing the Union's per capita payments to the IBEW office. (Pls.' 56.1 ¶ 85; Fratto Decl. ¶ 2.) Annunziata also tracked contractor payments for employees and informed contractors when they did not pay correctly, entered contractor report numbers into the computer, cross-checked Union

reports with international reports, and sent reports to the IBEW. (Pls.' 56.1 ¶ 86.) Additionally, Annunziata functioned as the Union's receptionist and a secretary for business agents. (*Id.* ¶ 87.) Her receptionist duties included, *inter alia*, greeting members who came into the office, processing medical benefit forms, giving members pension applications, referring members to business agents, making coffee, ordering food, completing mailings to the membership, assisting Pelletier with recording contractor payments, and processing annuity applications. (Pls.' 56.1 ¶ 88.) Throughout her employment with the Union, Annunziata worked from 9 A.M. through 5 P.M. and never worked overtime, nor was she ever expected to work on holidays, weekends, or days off. (Pls.' 56.1 ¶¶ 90–91.)

In contrast, Annunziata's purported comparator, Ross Olivieri, performed duties that required first-hand knowledge of the electrical trade. (Pls.' 56.1 ¶ 126; Olivieri Decl. ¶ 18.) Olivieri's decades of experience as an electrician was, thus, an important part of his role with the Union. Plaintiffs provide no evidence that Annunziata possessed similar levels of specialized skill, training, or experience. While Plaintiffs maintain that Annunziata would often handle referral calls when Olivieri was out of office, (Pls.' 56.1 ¶ 94; Annunziata Tr. 47:12-15; 174:5-13), Plaintiffs advance no argument that Annunziata ever performed any of Olivieri's other duties, such visiting job sites, processing jurisdictional disputes, meeting with organizers in the field, negotiating contracts, attending rallies, and teaching membership courses. (Pls.' 56.1 ¶ 125.)

Further, Annunziata and Olivieri did not share terms and conditions of their employment. Unlike Annunziata, Olivieri was required to remain on call for the Union twenty-four hours a day, seven days a week, 365 days a year. (Pls.' 56.1 ¶ 124; Olivieri Decl. ¶¶ 4–5.) And unlike Annunziata, Olivieri was required to work even on his days off and vacation time. (*Id.*) Finally,

Olivieri began his work day more than hour before Annunziata and had no specific end time. (*Id.*) Beyond arguing that a small portion of their work duties overlapped, Plaintiffs offer no evidence regarding how Annunziata and Olivieri's positions are substantively equal. That small overlap, however, is not enough to establish them as comparators for the purposes of the EPA. *See Miller*, 2018 WL 2059841, at *7 ("[A]ll that Plaintiffs point to in arguing that these positions are 'similarly situated' is that some work duties overlap. This ignores the myriad of factors, such as education, training, job requirements, job responsibilities, hours worked, and similar working conditions, all of which need to be considered.") Accordingly, Defendants' motion for summary judgment on Annunziata's EPA claim is granted.

### B. Title VII[4]

"The Equal Pay Act and Title VII must be construed in harmony, particularly where claims made under the two statutes arise out of the same discriminatory pay policies." *Barrett v. Forest Labs, Inc.*, 39 F. Supp. 3d 407, 451 (S.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 483 (2d Cir. 2001)).

While courts often evaluate EPA and Title VII claims using similar standards, there are key distinctions between the two types of claims. The first "difference between them, of course, is that a Title VII disparate treatment claim requires a showing of discriminatory intent, while an [EPA] claim does not." *Id.* (internal quotation marks omitted) (quoting *Lavin*, 239 F.3d at 483.) Moreover, "[u]nlike the EPA, Title VII does *not* "require that a plaintiff always be able to show

---

[4] As a preliminary matter, Defendants contend that a number of Plaintiff's unequal pay Title VII claims are time-barred. Specifically, Defendants maintain that "both Pelletier's and Marino's allegations that Heim and Graham are proper comparators are untimely." (Defs.' Mot. at 14.) As this Court's forthcoming Title VII analysis will elucidate, however, Defendants' arguments are inapposite—Plaintiffs need not provide valid comparators for their Title VII claim.

disparate treatment of an otherwise similarly situated employee as a necessary prerequisite to a prima facie case . . . ." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 n.2 (2d Cir. 2001) (citing *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001)); *see also Gunther*, 452 U.S. at 179 (declining to extend the EPA's "equal work" requirement to Title VII pay discrimination cases). Rather, a "Title VII plaintiff [may] succeed by showing that her employer intentionally depressed her wages, even if the employer did not employ any similarly-situated males." *Barrett*, 39 F. Supp. 3d at 452; *see also Gibson v. Jacob K. Javits Convention Ctr. of New York*, No. 95-CV-9728 (LAP), 1998 WL 132796, at *5 (S.D.N.Y. Mar. 23, 1998) ("Where, as here, a Title VII wage discrimination claim is asserted without an allegation that the jobs in question are substantially equal, the requisite showing under Title VII is merely that the plaintiff's wages were depressed because of intentional sex discrimination.").

In the present action, Plaintiffs have proffered sufficient admissible evidence from which a reasonable trier of fact could find that Defendants' compensation structure is intentionally discriminatory.[5] Namely, at the time of Plaintiff's EEOC charge, *no* female Union worker was

---

[5] The Court notes that there has been some division among the Circuits regarding the precise contours of Title VII lawsuits challenging sex discrimination in compensation where no similarly-situated comparators are available. Some Circuits have interpreted *Gunther* narrowly— suggesting that only evidence of discrimination that is direct, or "clear and straightforward," is sufficient to make out a Title VII wage discrimination claim not based on equal work. *E.E.O.C. v. Sears Roebuck & Co.*, 893 F.2d 302 (7th Cir. 1988); *see also Plemer v. Parons-Gilbane*, 713 F.2d 1127, 1133 (5th Cir. 1983) (finding that to succeed under a *Gunther*-based suit, a plaintiff must either show "transparently sex-biased system" for wage discrimination, or offer "direct evidence" that the employer paid her less than it would have been had she been male). Other Circuits, however, have applied less exacting standards, allowing for the consideration of circumstantial evidence of discriminatory animus. *See, e.g., Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518 (11th Cir. 1992); *Conti v. Universal Enterprises, Inc.*, 50 F. App'x 690, 698–99 (6th Cir. 2002).

However, because Defendants did not argue that this Court should apply the more exacting standard and because Plaintiffs *do* provide some direct evidence of discriminatory

23

provided the same benefits that *every* male Union worker was receiving. That disparity, coupled with evidence of various discriminatory statements purportedly made by Union business managers and other individuals with discretion over employee benefits over the years—including Joseph Maraia's statement that if Plaintiff Pelletier wanted benefits, she should "get under the desk" and Ray Frosco's statement that Ms. Marino could have benefits "if she had a penis" (Pelletier Decl. ¶ 45, Ex. 1; Marino Tr. at 241:14-17)—are sufficient to create a genuine issue of fact regarding whether Defendants' benefits structure was intentionally discriminatory.

The Court notes that Defendants offer non-discriminatory reasons for the benefits disparities; the Union's male employees, Defendants argue, generally possessed more competitive credentials and experience. However, the alleged statements made by Union decision-makers over the years, if deemed credible, *could* satisfy Plaintiffs' "ultimate burden of persuading the trier of fact that the [Union] intentionally discriminated against [them.]"[6]

---

animus among the Union's previous business managers, the Court need not address the precise contours of *Gunther* to find that summary judgment in favor of Defendants is not presently warranted.

[6] Though these statements were made outside of the actionable statutory period, the Supreme Court has explained that past discrimination "might in some circumstances support the inference that such discrimination continued, particularly where relevant aspects of the decisionmaking process [have] undergone little change." *Bazemore v. Friday*, 478 U.S. 385, 402 (1986) (internal quotation marks omitted). Moreover, the statute of limitations does not bar an employee from using past acts as background evidence in support of a timely claim. *Morgan*, 536 U.S. at 113; *see also Vaughn v. Empire City Casino at Yonkers Raceway*, No, 14-CV-10297 (KMK), 2017 WL 3017503, at *14 (S.D.N.Y. July 14, 2017) (considering racial comments made outside of the statutory period "to the extent they are relevant to show that Plaintiff's suspension and termination were racially motivated").

*Schnabel v. Abramsom*, 232 F.3d 83, 90 (2d Cir. 2000) (internal quotation marks omitted). Accordingly, Defendants' motion for summary judgment on Plaintiff's Title VII discriminatory compensation claim is denied.

### C. Sex-related NYSHRL claims

Defendants similarly moved for summary judgment on Plaintiffs' New York State Human Rights Law ("NYSHRL") pay discrimination claims. As Defendants noted, claims for discrimination under the NYSHRL are largely evaluated using the same analytical framework used in Title VII actions. (Defs.' Mot. at 12 (citing *Vill. of Freeport v. Barrella*, 814 F.3d 594, 610 n.63 (2d Cir. 2016))). Because this Court has already ruled that Defendants are not entitled to summary judgment on Plaintiffs' Title VII claims and Defendants fail to advance any independent reason to grant summary judgment on Plaintiff's NYSHRL pay discrimination claim, Defendants' motion is denied.

### D. New York Labor Law § 194 claims

Defendants' motion for summary judgment on Plaintiff's New York Labor Law claims, however, is granted. Under New York Labor Law § 194, "[n]o employee shall be paid a wage at a rate less than the rate at which an employee of the opposite sex in the same establishment is paid for equal work on a job the performance of which requires equal skill, effort, and responsibility, and which is performed under similar working conditions . . . ." N.Y.L.L. § 194(1). A claim pursuant to § 194 is, thus, "analyzed under the same standards applicable to the federal Equal Pay Act." *Talwar v. Staten Island Univ. Hosp.,* 610 F. App'x 28, 31 n.2 (2d Cir. 2015). Because Plaintiff failed to identify similarly situated comparators, Defendants' motion for summary judgment on Plaintiffs' New York Labor Law claim is granted.

### E. ADEA and age-related NYSHRL claims

Although Plaintiffs additionally appear to assert an age-related pay discrimination claim under the Age Discrimination in Employment Act (ADEA) and NYSHRL in their opposition to Defendants' motion for summary judgment, no such claims were explicitly raised in their Fourth Amended Complaint. Nor did the Fourth Amended Complaint contain any specific factual allegations that would support those claims—Plaintiffs did not identify any age-related comparators or allege any specific differential compensation or benefits based on their age. Indeed, the only references to possible age discrimination in the Fourth Amended Complaint are Plaintiffs' largely conclusory allegations that the Union has discriminated against Plaintiffs "by permitting an ongoing, severe, or pervasive pattern and practice of harassment against them by creating and maintaining a hostile work environment on the basis of age." (FAC ¶ 202.) Disparate treatment and hostile work environment claims, however, are distinct and require different showings. *See Boonmalert v. City of New York*, No. 17-CV-1465, 2018 WL 496846, at *2 (2d Cir. Jan. 22, 2018) (analyzing disparate treatment and hostile work environment claims under the ADEA via different standards). Raising one type of claim, thus, does not put Defendants on notice of the other.

Plaintiffs cannot, for the first time, raise an entirely new claim in their opposition to Defendants' motion for summary judgment. *Zappa v. Rykodisc, Inc.*, 819 F. Supp. 2d 307, 316 (S.D.N.Y. 2011) ("[A]n opposition to summary judgment is not the proper vehicle to raise additional claims."); *Buksha v. New York City Dep't of Corr.*, No. 06-CV-5363 (GEL) (DFE), 2007 WL 2947982, at *2 (S.D.N.Y Oct. 9, 2007) ("It is not appropriate for the Court to consider allegations made for the first time in response to defendant's motion."); *Melendez v. Schneiderman*, No. 13-CV-622 (GLS) (ATB), 2014 WL 2154536, at *10 (N.D.N.Y. May 22,

2014) (noting that "new claims may generally not be raised in opposition to a summary judgment motion"). Accordingly, this Court need not consider Plaintiff's newly raised ADEA and NYSHRL age-related disparate treatment claim, and Defendants' motion for summary judgment is granted as to those claims.[7] *Gachette v. Metro N.-High Bridge*, No. 17-CV-209, 2018 WL 456723, at *3 (2d Cir. Jan. 18, 2018) (noting that the district court did not have to reach ADEA and EPA claims which were raised for the first time in plaintiff's opposition to summary judgment).

---

[7] If Plaintiffs wished to assert additional claims, the proper course of action would have been to file a motion to amend the complaint. *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006). The Court notes, however, that such a motion, made this late in the litigation, would not have likely fared well.

Rule 15(a) of the Federal Rules of Civil Procedure instructs courts that leave to amend must be freely given. Fed. R. Civ. P. 15(a). "The court plainly has discretion, however, to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990); *see also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) ("A district court has discretion to deny leave [to amend] for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."). Here, an amendment would be "especially prejudicial . . . [since] discovery ha[s] already been completed and [Defendants] ha[ve] already filed a motion for summary judgment." *McCarthy*, 372 F. Supp. 2d at 700.

## II. Hostile Work Environment Claims[8]

### A. Title VII

#### i. Continuing Violation Doctrine

As a preliminary matter, Defendants contend that many of Plaintiff's hostile work environment allegations are untimely and may not be considered. This Court agrees.

As previously discussed, generally, discriminatory conduct occurring more than 300-days before the filing of an EEOC charge is not actionable. *See supra* Section I.B.i.; *see also Morgan*, 536 U.S. at 110 (noting that a party must file a charge within 300 days after a discrete retaliatory or discriminatory act occurred, or lose the ability to recover for it.) Because Plaintiffs' EEOC charge was filed on December 29, 2014, any acts occurring prior to March 4, 2014 are not actionable. There are, however, notable exceptions to this rule.

Under the continuing violation exception, for instance, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely, even if they would be untimely standing alone." *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 155–56 (2d Cir. 2012) (internal quotation marks omitted). Given "that the

---

[8] Although Plaintiffs asserted a hostile work environment claim under the ADEA in their Fourth Amended Complaint (*see* FAC ¶ 202), Plaintiffs no longer appear to pursue such a claim. Indeed, Plaintiffs failed to oppose Defendants' arguments that they are entitled to summary judgment because Plaintiffs have not provided sufficient evidence that their workplace was "permeated with discriminatory intimidation, ridicule, and insult" related to their ages. (Defs.' Mot. at 24.) Because Plaintiffs' opposition to Defendants' motion fails to oppose these arguments in any way and because this Court largely agrees with the substance of Defendants' argument, Defendants are granted summary judgment on this claim. *See Franklin v. Liberty Lines Transit, Inc.*, No. 13-CV-6701 (NSR), 2016 WL 1078283, at *13 (S.D.N.Y. Mar. 17, 2016), *aff'd*, 685 F. App'x 41 (2d Cir. 2017) (granting summary judgment on a claim where plaintiff failed to oppose defendant's arguments in favor of summary judgment in any way).

incidents constituting a hostile work environment are part of one unlawful employment practice," *Morgan*, 536 U.S. at 118, the continuing violation doctrine has often been found applicable to hostile work environment claims. *See Meckenberg v. New York City Off-Track Betting*, 42 F. Supp. 2d 359, 372 (S.D.N.Y. 1999) ("Evidence that supports a hostile work environment claim may also support the finding of a continuing violation."); *Riedinger v. D'Amicantino*, 974 F. Supp. 322, 326 (S.D.N.Y. 1997) (noting that "by its nature, a claim of 'hostile environment' discrimination turns on the existence of continuing violation." (internal quotation marks omitted)).

The Second Circuit has elaborated, however, that "[i]n order for a timely incident to prolong a hostile work environment created by earlier action, the timely incident must be sufficiently related to the prior events so that they can be said to be part of the 'same' hostile work environment." *Sanderson v. New York State Elec. & Gas Corp.*, 560 F. App'x 88, 91 (2d Cir. 2014) (summ. order) (citing *Morgan*, 536 U.S. at 118); *see also McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010) ("Under *Morgan*, a sexually offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related."). In deciding whether incidents of harassment and discrimination are sufficiently related, courts have considered factors such as (1) whether the timely and untimely harassment is of a similar nature, (2) whether the same individuals perpetuated the harassment, (3) the frequency and temporal proximity of the acts, and (5) whether the employer took any intervening remedial action. *See, e.g., McGullam*, 609 F.3d at 81 n.2, 82 n.3 (Calabresi, J., concurring); *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 329 (5th Cir. 2009) (finding two periods of harassment related where "the pre-and post-limitations period incidents involved the same type of harassment and were perpetrated by the same manager," but

nevertheless finding that the two periods of harassment were severed by "remedial action" taken by the employer); *Duncan v. Manager, Dep't of Safety, City & Cty. of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005) ("To determine whether these acts are part of the same hostile work environment, *Morgan* advises looking at the type of these acts, the frequency of the acts, and the perpetrator of the acts."); *Rowe v. Hussman Corp.*, 381 F.3d 775, 781 (8th Cir. 2004) ("[W]e conclude as a matter of law that the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to this action.").[9] These considerations, however, are not exhaustive, dispositive, or particularly rigid. Rather, as the Second Circuit has explained, "flexibility is useful in a context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment." *McGullam*, 609 F.3d at 77.

Here, considering the totality of the circumstances, the pre-limitations period incidents are not sufficiently related to the post-limitations incidents of harassment to constitute a single hostile work environment claim. Plaintiffs describe numerous instances of pre-limitations period harassment, including former supervisors telling Plaintiffs to "get under the desk" for benefits (Marino Decl., Ex. 1, Entry for 1999), commenting on Plaintiffs' breasts (Annunziata Decl., Ex.

---

[9] While Plaintiffs contend that the severity of the pre-limitations harassment should be considered, such that more severe pre-limitations harassment should militate in favor of finding a single hostile work environment (Pls.' Opp. 16), the Second Circuit appears to have rejected such an approach. *See McGullam*, 609 F.3d at 78, n.5. Indeed, the Second Circuit has noted that while "courts may evaluate relatedness by comparing the severity of latter-day and earlier incidents," the inquiry is *not* whether the pre-limitations conduct is especially severe. *Id.* Instead, "the more similar the incidents are in severity, the more likely it is that the incidents are related." *Id.* That is, mild timely harassment is more likely related to similarly mild past harassment than more severe incidents. The approach promoted by Plaintiffs would turn the test on its head.

1, Entry for 1980–1990), propositioning and groping Plaintiffs (Pelletier Decl., Ex. 1, Entry for

1980s to 2005), and even, on one occasion, Joe Maraia forcefully placing Plaintiff Pelletier's

hand on his penis (*Id.*, Entry for 12/27/1997). While these actions are undoubtedly deplorable,

they are not related to the later incidents of harassment in nature, severity, or source. Nor are the

incidents temporally proximate to the timely harassment claims.

      The only instances of purported harassment within the statutory period that Plaintiffs

identify are comments by the current Union business manager, Sam Fratto, regarding Plaintiffs'

orderliness and work attire, his preference for working with men, and calling certain women in

the office "slobs" and "annoying." (Marino Decl., Ex. 1, Entries for 12/2014 and 5/2014.) These

incidents, however, have taken place *decades* after many of the pre-limitations period

harassment, which dates back to the 1980, 90s, and early 2000s. Moreover, these more recent

incidents have been perpetrated by an entirely new business manager, as all the supervisors who

engaged in the earlier harassment have since resigned, passed away, or retired. (*See* Pls.' 56.1 ¶

14.) Indeed, Sam Fratto did not assume his positon as business manager until July 2011—well

after the most egregious incidents took place. (*Id.* ¶ 15.) Finally, Fratto's comments, while

perhaps harsh and inappropriate, are not similar in kind to the harassment perpetrated by his

predecessors. The pre-limitations harassing behavior was largely sexual in nature, whereas

Fratto's purported comments are not. Because the alleged former harassment is of a different

nature, so far removed in time, and perpetrated by completely distinct individuals than the more

recent harassment, this Court finds that it is not sufficiently related to Plaintiffs' timely

harassment claims to constitute a single hostile work environment. Accordingly, the Court

cannot consider those allegations for the purposes of Plaintiff's current claim.

      Plaintiffs argue that the Court may nonetheless consider unrelated harassment as

"background evidence" for their hostile work environment claim. This Court agrees.

The Second Circuit has not *squarely* addressed how unrelated incidents of harassment may, in certain circumstances, constitute valid background evidence for hostile work environment claims. However, in his *McGullam* concurring opinion, the Honorable Guido Calabresi addressed that very question. As Judge Calabresi explained, "[e]ven where incidents from outside the limitations period are not sufficiently related to within-limitations incidents to be actionable . . . , they may still be germane to a plaintiff's Title VII claim in a different way." *McGullam*, 609 F.3d at 86 (Calabresi, J., concurring). These incidents, Judge Calabresi elaborated, "may be admissible and probative as background evidence to support a claim based on alleged conduct that falls within the limitations period." *Id.* Where there is ambiguity regarding the discriminatory connotations of certain statements, for instance, "evidence that similar comments have previously been used by the same individual (or perhaps by others in the company) to harass on the basis of race or gender might well be relevant to how the later comments reasonably could be interpreted." *Id.* at 87. Moreover, particularly severe time-barred incidents may help inform the Court how a plaintiff, subjectively, perceived the subsequent discriminatory incidents.[10] *Id.* This Court will, therefore, consider the earlier instances of harassment to the extent they are relevant as background in analyzing Plaintiffs' timely hostile work environment claim.

ii. **Plaintiffs' Title VII Hostile Work Environment**

To establish a hostile work environment claim under Title VII, "a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation,

---

[10] The judges signing on to the majority opinion in *McGullam* indicated that they had "no quarrel" with Judge Calabresi's approach to time-barred incidents as "background evidence" for hostile work environment claims. *McGullam*, 609 F.3d at 79 n.7.

ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Trans. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (internal quotation marks omitted). This standard has both objective and subjective elements: "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). Importantly, "a plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Pucino v. Verizon Communications, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (emphases in original).

"In considering whether a plaintiff has met its burden as to the sufficiency of the purported harassment, 'courts should examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.'" *Marquez v. City of New York*, No. 14-CV-8185 (AJN), 2016 WL 4767577, at *8 (S.D.N.Y. Sept. 12, 2016) (quoting *Rivera*, 743 F.3d at 20). These "standards for judging hostility are sufficiently demanding to ensure that Title VII does not became a general civility code," and "[p]roperly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted).

Here, Plaintiffs testified about a number of incidents of purported harassment, mostly consisting of crass and impolite comments made by the Union's Business Manager, Defendant

Fratto, including:[11]

- In April 2014, San Fratto' stated that a woman in the office "wears too much makeup and dresses inappropriately." (Marino Decl., Ex. 1, Entry for 4/2014.)

- In May 2014, Sam Fratto commented that Plaintiff Annunziata "looks like she's ready to go out and collect bottles." (*Id.*, Entry for 5/2014)

- In October 2014, Sam Fratto referred to Plaintiff Annunziata as having the appearance of a "bag lady." (*Id.*, Entry to 10/2014.)

- In November 2014, Sam Fratto yelled throughout the office that "there were too many fat people" and that some individuals "should stay out of the snack closet." (*Id.*, Entry for 11/2014.)

- On December 19, 2014, Sam Fratto called Plaintiff Annunziata into his office and insulted for about 15 minutes, telling her she was "sloppy" and "dirty." (Annunziata Decl. ¶¶ 5–8.) He then proceeded to say that he did not like her clothes, her shoes, or her hair and instructed her to purchase a new wardrobe with her "fucking Christmas bonus." (*Id.* ¶¶ 9–13.)

- In January 2015, Sam Fratto told Plaintiff Marino that he did not "care if she retired 3 to 5 minutes from now." (Marino Decl., Ex. 1, Entry for 1/05/2015.)

- Throughout his tenure as Business Manager, Sam Fratto referred to the women in

---

[11] The Court notes that the parties' respective 56.1 statements omit many facts relating to the incidents of harassment constituting Plaintiffs' hostile work environment claim. The Second Circuit has ruled that a court "is not required to consider what the parties fail to point out in their Local Rule 56.1 statements." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks omitted). For the sake of thoroughness, however, these facts are derived from the Court's own "assiduous review of the record," to more closely track the allegations included in Plaintiffs' Fourth Amended Complaint. *Id.*

the office as "girls" and the "girl train." (*See, e.g.*, Marino Decl., Ex. 1, Entry for 12/2014.)

Considering the totality of the circumstances, this Court concludes that no reasonable jury could find that these incidents rise to the level of actionable hostile environment harassment. First, Plaintiffs do not adduce sufficient evidence to suggest that Sam Fratto's comments were particularly frequent or pervasive. *See Spina v. Our Lady of Mercy Med. Ctr.*, No. 97-CV-4661 (RCC), 2003 WL 22434143, at *3 (S.D.N.Y. Oct. 23, 2003), *aff'd*, 120 F. App'x 408 (2d Cir. 2005) (finding six specific instances of harassment over the course of 15 months insufficient to constitute pervasive harassment, even where Plaintiff claimed that such harassment was "constant" but was unable to testify as to the particulars of any other incident); *cf. Cruz v. New York State Dep't of Corr. & Cmty. Supervision*, No, 13-CV-1335 (AJN), 2014 WL 2547541, at *4 (S.D.N.Y. June 4, 2014) (finding allegations that plaintiff's supervisor "made *almost-daily comments for over three years*, remarking upon his physical appearance, gender, and sexual attractiveness" sufficient to state a hostile work environment claim).

While "the Second Circuit and other courts have held that even solitary incidents of verbal or visual harassment may qualify as sufficiently severe to create a hostile work environment," *Perry v. Slensby*, No. 16-CV-08947 (NSR), 2018 WL 1136922, at *7 (S.D.N.Y. Feb. 28, 2018) (collecting cases), the harassment at issue here is not especially severe. Defendant Fratto's comments were not sexual in nature, they were not overly profane, nor were they accompanied by any rude or physically threatening gestures. *Compare Perry*, 2018 WL 1136922, at *6 (finding allegations that a defendant told plaintiff, "If I was a female, I would fuck the shit out of you, and I would get a strap on and go for broke up your ass," while giving plaintiff an unsolicited back massage sufficiently severe to withstand a motion to dismiss), *with*

*Marquez*, 2016 WL 4767577, at *9 (finding incidents of harassment insufficiently severe where there was no evidence in the record that any of the purportedly harassing conduct was physically threatening or interfered in any way with Plaintiff's work), *and Spina*, 2003 WL 22434143, at *3 (finding sporadic comments insufficiently severe where they were not accompanied by any physically offensive gesture, did not contain a great deal of profanity, and were not sexually suggestive or explicit.). Fratto's relatively infrequent, non-threatening, and non-sexual comments, thus, do not objectively amount to a hostile work environment. *See Marquez*, 2016 WL 4767577, at *14 (noting that "regrettably mundane workplace travails—temper flares, personality clashes, public chastisement, inconvenient schedules—[ ] while no doubt unpleasant, do not support Title VII claims"); *Hahn v. Bank of Am. Inc.*, 12-CV-4151, 2014 WL 1285421, at *23(S.D.N.Y. Mar. 31, 2014), *aff'd sub nom. Hahn v. Bank of Am. N.A.*, 607 F. App'x 55 (2d Cir. 2015) (approximately seven incidents in which a supervisor "yelled or screamed" at plaintiff or "otherwise embarrassed her" in front of her co-workers did not constitute a hostile work environment).[12] Defendants' motion for summary judgement on Plaintiffs' Title VII hostile work environment claim is, therefore, granted.

---

[12] Though *Hahn* relates to a retaliatory hostile work environment claim, the analysis is nonetheless relevant to the present action. *See Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001) ("[W]e apply the same standards in determining whether *retaliatory* harassment constitutes an adverse employment action as we do in assessing whether harassment *imposed because of sex* works an actionable alteration in the terms or conditions of employment." (emphasis in original)).

**B. NYSHRL hostile work environment claim**

Generally, "[h]ostile work environment claims under Title VII and the NYSHRL are governed by the same standard." *Rogers v. Bank of New York Mellon*, No. 09-CV-8551 (HBP), 2016 WL 4362204, at *11 (S.D.N.Y. Aug. 15, 2016), *on reconsideration*, 2017 WL 4157376 (S.D.N.Y. Sept. 19, 2017) (internal quotation marks omitted) (quoting *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015)). Under New York law, however, a hostile work environment claim is subject to a three-year statute of limitations. *Cahill v. State*, 31 N.Y.S.3d 553, 555 (2d Dep't 2016) (citing CPLR 214[2]).[13] Accordingly, some allegations that were outside of the federal statutory period maybe considered for Plaintiff's state law claim. The only additional claim, however, is that that a male manager told a vendor that Plaintiffs Annunziata and Pearson were not the "brightest bulbs in the bunch." (Pearson Tr. at 63:2-15.) Plaintiffs fail to adduce any evidence from which the Court could infer that such a comment was motivated by sex. Further, even if the evidence did support such an inference, this incident does not establish a hostile work environment as it is equally episodic and insufficiently severe as the other incidents of harassment.[14] Thus, Defendants' motion for summary judgment on Plaintiff's NYSHRL hostile environment claim is also granted.

---

[13] Some courts in this Circuit have noted that "there is a split in authority as to whether analysis of a continuing violation under New York law should proceed according to Second Circuit precedent, or according to a broader standard, established by some state courts, that focuses on whether the discriminatory practice had a continuing impact on the complainant." *Kalola v. Int'l Bus. Machines Corp.*, No. 13-CV-7339 (VB), 2015 WL 861718, at *9 (S.D.N.Y. Feb. 3, 2015); *see also Torres v. New York Methodist Hosp.*, No. 15-CV-1264 (PKC) (PK), 2016 WL 3561705, at *8 (E.D.N.Y. Jan. 7, 2016). However, there are a number of recent state court cases seemingly applying the federal standard for a continuing violation to claims under the NYSHRL. *See, e.g.*, *Lozada v. Hook*, 54 N.Y.S.3d 688 (2d Dep't 2017); *Cahill v. State*, 31 N.Y.S.3d 553 (2d Dep't 2016). Accordingly, this Court will do the same.

## II. Retaliation Claims

Defendants next contend that they are entitled to summary judgment on Plaintiff's

retaliation claims. The Court now considers each claim independently.

### A. Title VII

Title VII retaliation claims "are evaluated using a three-step burden shifting analysis."

*Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010).

First, to establish a prima facie case of retaliation, a Plaintiff must adduce sufficient

evidence from which a reasonable trier of fact could find:

> (1) that [ ]he engaged in protected activity under the anti-discrimination statutes,
> (2) that the employer was aware of this activity, (3) that the employer took
> adverse action against the plaintiff, and (4) that a causal connection exists
> between the protected activity and the adverse action, i.e., that a retaliatory motive
> played a part in the adverse employment action."

*Gachette v. Metro N.-High Bridge*, No. 17-CV-209, 2018 WL 456723, at *2 (2d Cir. Jan. 18,

2018). An action is sufficiently adverse to sustain a claim of retaliation where it is "harmful to

the point that [it] could well dissuade a reasonable worker from making or supporting a charge of

discrimination." *Hicks v. Baines*, 593 F.3d 159, 162 (2d Cir. 2010) (internal quotation marks

omitted).

If a plaintiff satisfies this initial burden, "a presumption of retaliation arises." *Hicks*, 593

F.3d 164 (internal citation omitted). The burden of production then shifts to the defendant, who

must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.*

(citation omitted). If defendant articulates such a justification, the employee must then show

"that retaliation was a substantial reason for the adverse employment action." *Id.* (internal

quotation marks omitted). Notably, a plaintiff can carry this burden by proving that "a retaliatory

motive played a part in the adverse employment actions even if it was not the sole cause." *Id.*

That is, "if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]." *Id.* at 164–65(internal quotation marks omitted).

In the present action, Plaintiffs contend that they were subjected to various acts of retaliation for filing their EEOC charge and otherwise voicing their concern regarding the Union's purportedly discriminatory practices. Defendants do not dispute that Plaintiffs engaged in protected activity, but contend that Plaintiffs fail to adduce sufficient evidence to establish the other prongs of their retaliation claims.

The Court now evaluates each of Plaintiffs' retaliation claims individually.

### i.    Carol Pearson

Plaintiff Pearson admitted that she did not personally experience any retaliation for filing a charge with the EEOC. (Pls.' 56.1 ¶ 138.) As Plaintiffs fail to advance any other theory of retaliation in their opposition, Defendants' motion for summary judgment on Plaintiff Pearson's Title VII retaliation claim is granted.

### ii.    Rosemarie Pelletier

During her deposition, Plaintiff Pelletier testified that she believed Fratto retaliated against her for speaking with Trustee Richard Parker about benefits for the clerical staff in November 2015. (Pelletier Tr. 123–131; 134:2-10.) The only "adverse employment action" that she alleges was taken against her, however, was the new benefits package that was offered to the Union's clerical workers. (*Id.*) Pelletier testified that she believed this offer was retaliatory because while it conferred some additional benefits, she would be subject to a reduction in her pay rate by $3.20 per hour if she accepted it. (*Id.* at 123: 1-8.)

The form circulated to the Union's employees, however, made clear that they had the

option to opt-in to the new benefits package, or "keep [their] existing compensation and conditions." (Pls.' 56.1 ¶¶ 34–35; Kaplan Decl., Ex. U, December 2014 Offer to Clerical Workers.) Though the Court is cognizant that this offer did not fully provide Plaintiffs with the full benefits and compensation they sought, Plaintiffs were given the choice to remain under their current compensation structure. No fair-minded trier of fact could find that the mere *option* to receive more benefits for a decrease in pay, alone, could dissuade a reasonable worker from making or supporting a charge of discrimination.

Because Plaintiff offers no other allegedly retaliatory actions perpetrated against Pelletier, Defendants' motion for summary judgment as to Pelletier's Title VII retaliation claim is granted.

### iii. Carmela Marino

Defendants' motion for summary judgment on Plaintiff Marino's retaliation claim, however, is denied. First, Defendants do not dispute that Marino engaged in protected conduct of which Defendant Fratto was aware. Marino, thus, satisfies the first two prongs of her prima facie retaliation claim.

Marino has similarly adduced sufficient evidence to satisfy the third prong—identifying an adverse action taken by her employer that would dissuade a reasonable employee from complaining of discrimination. Marino identified a number of purported adverse actions taken against her in retaliation for her advocacy on behalf of herself and the other clerical workers, including:

- In January 2015, Fratto changed some of Marino's duties and responsibilities—she was no longer tasked with the "Dodge Reports," preparing executive board minutes, or travel and conference scheduling.

Further, she was denied access to Fratto's calendar and email as well as access to the officer's American Express credit card, which she had previously used to order office materials. (Marino Decl., Ex. 1, Entry for January 13, 2015.)

- In January 2015, Pam Brown took over Marino's duties as Office Manager. (Marino Decl., Ex. 1, Entry for January 5, 2015).

- In February 2015, Marino and the other clerical workers were instructed to turn in the keys for any desk drawers or file drawers. Marino contends that certain files may have been removed from her desk, although she is not certain. (Marino Decl., Ex. 1, Entries for 2/18/2015 & 2/19/2018.)

- In February 2015, Marino's desk was moved to the "front window," which subjected her to frequent distractions and interruptions. (Marino Decl. ¶ 12.)

- On March 13, 2015, Marino was ordered to return her master key and was instead given a key that opened the office's front door, but would not give her access to any other portion of the building. (Marino Decl., Ex. 1, Entry Entry for 3/13/2015)

- On March 17, 2015, Marino's remote access to the Union's computer system was disabled. (Marino Decl., Ex. 1, Entry for 3/17/2015.)

- April 2015, Mr. Marino was not provided the same training to reboot the office's computer system received by other clerical workers. (Marino Tr. 298–99.)

Marino's retaliation claim is, thus, based on her alleged "decimation of all the status and responsibility she had accumulated during her years of employment." (Pls.' Mot. at 20.)

The Supreme Court has noted that "reassignment of job duties," though "not automatically actionable," *may* constitute materially adverse actions. *Swiderski v. Urban Outfitters, Inc.*, No. 14-CV-6307 (JPO), 2017 WL 6502221, at *11 s(S.D.N.Y. Dec. 18, 2017) (internal quotation marks omitted) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington*, 548 U.S. at 71 (internal quotation marks omitted) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

Based on Marino's testimony that she was stripped of her title as Office Manager, stripped of various responsibilities and privileges denoting her trusted positon at the Union (including her remote access to the computer system, her master key, her access to the company credit card), and relocated to a less desirable location in the office, the trier of fact could conclude that such changes would have dissuaded a reasonable worker from complaining about discriminatory conduct. *See Hicks*, 593 F.3d 159 at 169 (concluding that evidence that defendant "intentionally adjusted shift times, break times, work locations, and work assignments," was sufficient to survive summary judgment as to adverse action element of retaliation claim); *Burlington*, 548 U.S. at 71 (finding reassignment from forklift operator to track laborer sufficient to constitute an adverse action where evidence indicated that the track laborer position was more prestigious and considered a better position); *Swiderski*, 2017 WL 6502221, at *12 (finding that reassignment to back-stock duties sufficient to constitute an adverse action where back stock was generally perceived as undesirable and plaintiff had no training in back stock tasks). Marino has, thus, adduced sufficient evidence to satisfy the third prong of her retaliation claim at the

summary judgment phase.

Marino similarly satisfies the fourth and final prong of a prima facie retaliation claim; she has provided sufficient evidence to suggest a causal connection between her protected activity and her employer's adverse action.  A plaintiff may satisfy this causation requirement in one of two ways: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." *Hicks*, 593 F.3d at 170 (internal quotation marks omitted). "Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action *may* in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." *Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441, 461 (S.D.N.Y. 2012), *aff'd sub nom. Nolley v. Swiss Re Am. Holding Corp.*, 523 F. App'x 53 (2d Cir. 2013) (internal quotation marks omitted). While the Second Circuit has not established a bright line rule defining "the outer limits beyond which a temporal relationship is too attenuated to establish casuation," it has previously held that even five months is not too long to find a causal relationship for purposes of a prima facie case. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

Here, Marino's prima facie showing of causation is satisfied by the temporal proximity between her protected conduct and the purported adverse actions.  Notably, Plaintiffs began more firmly voicing their concerns regarding the Union's alleged discrimination around November 2014—when Richard Parker decided to bring the women's concerns to Sam Fratto's attention. (Pls.' 56.1 ¶ 202.) Marino, in turn, began experiencing the aforementioned adverse actions just over one month later—in January 2015. (Marino Decl., Ex. 1.)

Beyond temporal proximity, however, Marino offers more evidence from which a causal connection between her protected conduct and Defendant Fratto's purported adverse actions may be inferred. Specifically, Plaintiffs submitted an email sent by Fratto in which he expressed his frustration with his wife by saying that he would "fire her tonight[,] in fact, she is getting her own personal package like Rose [Pelletier,] Carmela[Marino,] and Krystyna [Annunziata] tomorrow." (Kaplan Decl., Ex. T, Fratto Dec. 22, 2014 email). This email, sent shortly after Richard Parker spoke with Sam Fratto about the concerns of these women regarding their compensation and benefits structure, could evince that Fratto harbored retaliatory animus against Plaintiffs. (Pls.' 56.1 ¶ 202.)

Thus, the email coupled with the temporal proximity between Plaintiffs' protected conduct and the adverse actions suffered by Marino are sufficient to satisfy the causation requirement of Marino's prima facie case for retaliation.

The burden, thus, shifts to Defendants to articulate a substantial reason for the adverse employment actions—a burden which Defendants have satisfied. Namely, Fratto testified that his decision to remove Marino as Office Manager and reassign her duties was the result of a need to shift the workload among the remaining clerical staff due to Pearson's and Pelletier's retirements. (Defs.' 56.1 ¶ 147; Fratto Decl. ¶ 52; Fratto Tr. 338–39.) Moreover, Marino's desk was moved because she assumed some of Pelletier's duties, including staffing the front window. (Defs.' 56.1 ¶ 148; Brown Decl. ¶ 2.) Some of Marino's duties were subsequently re-assigned to other clerical workers after she voiced her concerns about being relocated to the front window and how the frequent interruptions might interfere with her work. (Pls.'s 56.1 ¶¶ 149–151.) These legitimate, non-discriminatory, explanations for Sam Fratto's decision-making satisfies Defendants' burden at this stage.

Nonetheless, this Court finds that Marino has, though just narrowly, adduced sufficient evidence of pretext to survive summary judgment on her retaliation claim. The Second Circuit has noted that temporal proximity, alone, is insufficient to satisfy a plaintiff's burden to bring forward some evidence of pretext. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). However, coupled with the email sent by Fratto suggesting his desire to fire Marino and the others who voiced their concern for the Union's benefits structure, the timing of Defendants' actions could lead to an inference of pretext. Accordingly, Defendants' motion for summary judgment on Plaintiff Marino's retaliation claim is denied.

### i. Krystyna Annunziata

The Court similarly denies Defendants' motion for summary judgment on Plaintiff Annunziata's retaliation claim.

Like Marino, Annunziata has satisfied her prima facie showing of retaliation. First, Defendants do not dispute that she engaged in protected conduct in the form of the EEOC charge, of which Sam Fratto was aware. Second, she has adduced evidence that she suffered an adverse employment action—her termination in April 2016. *Guzman v. News Corp.*, No. 09-CV-09323 (LGS), 2013 WL 5807058, at *21 n.7 (S.D.N.Y. Oct. 28, 2013) (opining that termination "indisputably constitutes and adverse employment action").

Moreover, while somewhat tenuous, Annunziata has also provided sufficient evidence of a causal connection between her termination and her protected conduct. As this Court has already noted, "Title VII is violated when a retaliatory motive plays a part in adverse employment actions toward and employee, *whether or not is was the sole cause*." *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (internal quotation marks omitted) (emphasis added). Here, a reasonable trier of fact *could* find that Fratto's email suggesting his desire to fire

Annunziata, Pelletier, and Marino shortly after he was confronted by Parker about Plaintiffs' complaints of discrimination suggests that, but for those complaints, Fratto would not have so readily fired Annunziata after her *27 years* of service to the Union. Annunziata has, thus, satisfied her burden of making her prima facie showing of retaliation.

Defendants, however, have also satisfied their burden of producing non-discriminatory reasons for their adverse action. Specifically, Fratto maintains that Annunziata was fired for her failure to file the Union's per capita tax report for several months. (Pls.'s 56.1 ¶ 172; Fratto Decl. ¶ 77.) Paying the per capita tax had been one of Annunziata's responsibilities since she began her employ with the Union nearly three decades ago. (Pls.' 56.1 ¶ 173.) Yet, according to Fratto, Annunziata was unable to provide a satisfactory explanation why the report had not been submitted. (Fratto Decl. ¶ 74.) Annunziata was terminated shortly thereafter. (*Id.* ¶¶ 76–77.)

While Fratto's justification for Annunziata's termination is compelling, Annunziata has adduced sufficient evidence of pretext to overcome Defendants' motion for summary judgment on her retaliation claim. Namely, Annunziata testified that such delays in paying the per capita tax had occurred in the past with absolutely no repercussions. (Annunziata Tr. at 232: 21-25; 237: 9–10; 245–246.) Moreover, Annunziata further testified that she waited to pay the tax at the request of another worker, Marybeth Thomas, who was working to reconcile the Union's computer records with Annunziata's paper report—a request that Annunziata purportedly cleared with her superior, Pam Brown. (*Id.* at 233:1-21; 243:3-6.) Given Annunziata's testimony that she delayed the payment *with* the knowledge and assent of her superior and that such payments had been similarly delayed in the past without issue, a reasonable fact-finder could find that Fratto's justification for Annunziata's termination is pretextual—particularly in light of his email, which arguably expressed a desire to fire Annunziata following her complaints of discrimination.

Because there are sufficient issues of fact to overcome summary judgment, Defendants' motion for summary judgment on Annunziata's Title VII retaliation claim is denied.

## B. EPA and ADEA Retaliation Claims

Retaliation claims pursuant to the EPA and ADEA are governed largely by the same framework used for Title VII claims. *See Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006) ("The ADEA contains a nearly identical provision [to Title VII] prohibiting retaliation for complaining of employment discrimination on the basis of age, and the same standards and burdens apply to claims under both statutes." (internal citations omitted)); *Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 312 (S.D.N.Y. 2016) ("The same standard applies for retaliation claims under Title VII [and] the Equal Pay Act . . . ."). Moreover, Defendants failed to advance any distinct arguments for summary judgment on these claims. (Defs.' Mot. at 32.) Accordingly, largely for the reasons discussed above, the Court grants summary judgment in favor of Defendants on Plaintiff Pelletier and Pearson's retaliation claims under the EPA and ADEA, but denies the motion for summary judgment on the EPA and ADEA retaliation claims by Plaintiffs Annunziata and Marino.

## C. New York State Retaliation Claims

Defendants' motion for summary judgment on Plaintiffs' New York state retaliation claims is similarly granted in part and denied in part. Retaliation claims under the NYSHRL and NYLL are generally analyzed under similar frameworks as Title VII claims. *See McCoy v. Morningside at Home*, No. 11-CV-2575 (LTS), 2014 WL 737364, at *8 (S.D.N.Y. Feb. 25, 2014), *aff'd*, 601 F. App'x 57 (2d Cir. 2015) (noting that claims under the NYLL § 215 "are subject to analysis under the *McDonnell Douglas* burden-shifting framework"); *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361 (S.D.N.Y. 2012) (noting that retaliatory

discrimination claims under the NYSHRL are "analyzed using the same burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas*" (internal citation omitted)). Thus, for substantially the same reasons articulated above, summary judgment in favor of Defendants is granted as to Pelletier and Pearson's state law retaliation claims, but denied as to Annunziata and Marino's state law retaliation claims.

## III.    Aiding and Abetting Claim

Finally, Defendants' motion for summary judgment on Plaintiffs' NYSHRL aiding and abetting claim is denied.

"Notably, the NYSHRL makes it unlawful for an *employer* to discriminate." *Colon v. Mark-Viverito*, No. 16-CV-4540 (VSB), 2018 WL 1565635, at *9 (S.D.N.Y. Mar. 26, 2018) (internal quotation marks omitted). Nevertheless, the NYSHRL also allows for "[i]ndividuals who are not a plaintiff's employer to be held liable for aiding and abetting discriminatory or retaliatory conduct." *Hughes v. Twenty-First Century Fox, Inc.*, No. 17-CV-7093, 2018 WL 1940175, at *14 (S.D.N.Y. Apr. 24, 2018); *see also* N.Y. Exec. Law § 296(6) ("It shall be unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.").

The only argument Defendants advance in favor of summary judgment is that Defendant Fratto cannot be held liable for aiding and abetting without any underlying liability on behalf of the Union for discrimination and retaliation under the NYSHRL. Defendants' arguments, however, are misplaced given that NYSHRL claims for retaliation and discrimination remain against the Union. Because Defendants do not put forth any other argument in favor of summary judgment on Plaintiffs' aiding and abetting claims, Defendants' motion is denied.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to: (1) each Plaintiff's EPA and NYLL discriminatory compensation claims, (2) each Plaintiff's ADEA and NYSHRL age-related disparate treatment claims, (3) each Plaintiff's Title VII, ADEA, and NYSHRL hostile work environment claims, and (4) Pelletier and Pearson's retaliation claims. However, Defendants' motion for summary judgment is DENIED as to: (1) Plaintiffs' Title VII and NYSHRL discriminatory compensation claims, and (2) Annunziata and Marino's retaliation claims.

The parties are directed to appear for an in-person Pre-Trial Conference on June 22, 2018 at 11:30 A.M., at the Charles L. Brieant United States Courthouse, 300 Quarropas Street, White Plains, NY 10601, Courtroom 218.

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 44.

Dated: May 29, 2018          SO ORDERED:
      White Plains, New York

                                   NELSON S. ROMÁN
                             United States District Judge